Bill MATHIS and Dallas Smith,
Plaintiffs–Appellees,

v.

Nugent T. BRASHER, Jr. and Bravo Resources, Inc., Defendants–Appellants.

Nos. 89–1313, 89–1527.

United States Court of Appeals,
Fifth Circuit.

Dec. 29, 1989.

W. Clint Parsley, Austin, Tex., for defendants-appellants.

C.H. Brockett, Jr., Brockett, Cunningham & Bates, Midland, Tex., for plaintiffs-appellees.

Before GARZA, WILLIAMS and DAVIS, Circuit Judges.

PER CURIAM:

Affirmed on the basis of the memorandum decision of the district court which is attached as an appendix.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, MIDLAND–ODESSA DIVISION

BILL MATHIS and DALLAS SMITH, Plaintiffs,

versus

NUGENT T. BRASHER, JR. and BRAVO RESOURCES, INC., Defendants.

CIVIL NO. MO–88–CA–018

MEMORANDUM OPINION

(Filed Feb. 8, 1989)

This matter was tried to the court on May 18–19, 1988, and continued for submission on briefs. After reviewing those briefs, together with the two volumes of the Statement of Facts, the trial exhibits, and notes taken during trial, and listening to the many hours of telephone conversations recorded by the parties, the court makes the following findings of fact and conclusions of law.

Bill Mathis and Dallas Smith, residents of Midland, Texas, filed suit against Nugent T. Brasher, Jr., a resident of Glenwood, New Mexico, and Bravo Resources, Inc., a New Mexico corporation owned in equal proportions by Brasher and Stephen Rothman, seeking declaratory judgment and, alternatively, a judgment for damages. Mathis seeks a declaration that he owns either 50% or 25% of all oil and gas interests acquired by Nugent/Bravo Resources as a consequence of investments by Layton Humphrey or his company, Humphrey Exploration Company, in oil and gas prospects in an area referred to as "Four Corners," located in Martin, Dawson, Andrews, and Gaines Counties, Texas. In the event the court concludes that Mathis has no contractual right to the claimed interest, Mathis alternatively seeks a money judgment for damages sustained as a consequence of false and fraudulent representations allegedly made by Brasher. Smith seeks a judgment declaring that he is entitled to a 2% interest from Brasher for the part he played in introducing Brasher to Layton Humphrey.

The court has diversity jurisdiction under 28 U.S.C. § 1332.

*Findings of Fact*

Mathis, an experienced independent oil operator, is a longtime resident of Midland, Texas. He is a landman and performs all of the functions associated with that profession, but he principally arranges and structures oil and gas "deals."

For many years Mathis was involved in various oil and gas partnerships with Brasher's father. After the death of the senior Brasher, Mathis and Brasher had a discussion about the future of the oil and gas business. Brasher told Mathis that he had some prospects in Lea County, New Mexico that might be of interest and invited Mathis to visit him.

In early February 1986, Mathis and Brasher met in Houston. The meeting was not planned. Brasher gave Mathis a quick scan of several Devonian leads in an area

in New Mexico known as "Bronco" (sometimes referred to as Tatum Basin or the "O'Neill Study"). Brasher flew from Houston to Midland in Mathis' plane, at which time Brasher spent several hours explaining a method of computerized geological studies he was developing. In essence, by feeding vast amounts of known geological data produced by present and past wells and other exploration exercises into a computer, one could find likely prospects of overlooked structures.

Brasher needed help to locate investors to provide the funds to update his computerized geological data base and to develop prospects thus located. Mathis found the concept intriguing and agreed to use his contacts in the oil business to locate an investor. To that end, Mathis arranged nine meetings for Brasher and himself with prospective investors.

At these meetings, which occurred between February and September 1987, Mathis, usually known to the investors from prior dealings, introduced Brasher as a geologist and computer whiz and spoke generally about the project. Brasher, with the aid of maps and props, explained the procedure and how it was expected to generate sound geological data reflective of solid drilling prospects. The presentations dealt with the computer concept in general and with specifics about the Bronco area.

Brasher's data on Bronco was several years old and needed updating. The typical proposal offered the various investors envisioned the investor paying for the updating of the data base and for the seismic work on three prospects. If the investor found a prospect sufficiently promising, Mathis and Brasher were to receive a cash bonus of $15,000 plus 6% of 8/8 overriding royalty. Brasher and Mathis were to divide the cash and override equally. Each investor received a letter from Mathis setting forth these details. The court finds that Brasher was aware of these letters and approved their content.

Mathis personally provided the entree to each of the prospective investors except Humphrey. Mathis was not personally acquainted with Humphrey. The introduction to Humphrey was provided by Smith, a pilot, who had flown planes for Humphrey. In return, Smith understood that he was to receive a 2% interest from Mathis and a 2% interest from Brasher. Mathis has consistently acknowledged this interest; Brasher has consistently denied knowledge of it.

The proposal Mathis and Brasher offered to Humphrey differed from the others. It envisioned Humphrey owning 50% of the leases developed with Brasher and Mathis equally dividing the other 50%. The Humphrey proposal did not include a cash payment to Mathis and Brasher or an override. Humphrey implicitly declined the proposal, based on a disenchantment with the southeastern New Mexico area. Humphrey and his consultants, however, obviously were interested in the computerization of geological data and the promising leads that new geological methodology generated.

No investor responded and interest in the Bronco area faded. The focus of the computer studies moved to a Permian Basin Production Analysis. Humphrey had not been attracted to the Bronco prospects, apparently because one of his consultants had drilled one or more wells there with negative results, but he was interested in the new approach to geological data collating and processing. He agreed to fund the computer study for the Four Corners area and, as of the time of trial, he had paid nearly $300,000 for that work.

The agreement between Humphrey's company, Humphrey Exploration Company, and Brasher and Rothman's company, Bravo Resources, Inc., provided for an equal division between them of any interest acquired.

About the time the Bronco efforts folded, Brasher began to back away from his arrangement with Mathis. Their relationship became strained but they continued their conversations, primarily by telephone, most of which were recorded, and by letter exchanges. The original agreement involving Bronco was between Mathis and Brasher, and called for a 50–50 split of any monies and oil and gas interests acquired by their efforts. Mathis would locate a potential investor and, trading on his long experience

and reputation, would vouch for and introduce Brasher who, in turn, would seek to sell the computer-geology concept and the specific leads. If a deal resulted, Mathis was to provide the required landman and related services. Somewhere along the way Bravo Resources came on the scene. At that time, Brasher indicated that he no longer was prepared to divide equally with Mathis because of his obligations to Rothman and others.

The telephone conversations, letters, and exchange of drafts of an agreement, considered in light of the testimony in open court and by deposition, inexorably lead the court to the finding that an agreement existed between Mathis and Brasher, individually and for Bravo Resources, affecting the Four Corners area for which Humphrey's funds were used to develop the geological data base. In making this finding, it was necessary that the court make several critical credibility assessments. The court largely credits the testimony of Mathis, rejecting the contrary testimony of Brasher.

The court finds that the agreement between Mathis, Brasher, and Bravo Resources entitles Mathis to 25% of any oil, gas, or other mineral interest received by Brasher and/or Bravo Resources or their nominee, resulting from their agreement with Layton Humphrey, Humphrey Exploration Company, or any Humphrey-dominated entity, respecting oil and gas exploration in the area known as Four Corners in the Texas counties of Martin, Dawson, Andrews, and Gaines. This would include any cash received as a consequence of leasing and drilling but would not include any sums received by Brasher or Bravo Resources for the costs of preparing the computer geological workup.

In making this finding the court relies on the open court testimony, letter exchanges, memoranda, draft agreement exchanges, including those signed separately by Mathis and Brasher, and the various recorded telephone conversations. These telephone conversations were very telling. For example, in a telephone conversation between Mathis and Brasher on September 25, 1987,

after a lengthy discussion Brasher said: "We now have an understanding. The understanding is this—that you're entitled to a quarter of Bravo's position." Mathis responded: "O.K." Brasher continued: "That's what you wanted." Mathis says "Right." Brasher concluded: "That's what you got." After noting that the agreement with Humphrey was with Bravo, Brasher told Mathis that his agreement would also be with Bravo. Brasher said: "As far as your interest, now, the quarter is fixed, Mathis, don't concern yourself with thinking that it is not." Mathis responded: "Alright."

Subsequent to this discussion, on October 15, 1987, Mathis and Rothman had their first telephone conversation of which the court is aware. The conversation continued on October 16, 1987 during which Rothman agreed to reduce their discussions to writing. Rothman did so and sent Mathis an agreement dated October 17, 1987, signed by Brasher as president of Bravo Resources.

On October 23, 1987 Mathis and Rothman had a very lengthy telephone conversation in which they discussed the October 17, 1987 agreement. Near the conclusion of that long session Mathis summed up their discussion by saying: "I think we are pretty well agreed." And they were.

The court further finds that the letters, memoranda, and draft exchanges suffice to constitute a written contract between the parties. The recorded conversations explain and enhance the writings.

Finally, the court finds that although Mathis agreed that Smith would receive a 2% interest from him and a like interest from Brasher, neither Brasher, individually, or Brasher or Rothman on behalf of Bravo Resources ever committed to that payment. Mathis candidly concedes such in his telephone conversation with Smith on October 16, 1987.

## Conclusions of Law

In this diversity case, as an Erie court we seek to apply the law of the forum state of Texas. Under Texas law, a contract is enforceable if its terms are rea-

sonably certain and ascertainable. In *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1122 (5th Cir.1984), a diversity case applying Texas contract law, the Fifth Circuit observed that "under Texas law ... a contract is sufficiently definite if a court is able to determine the respective legal obligations of the parties." *See, e.g., Moore v. Dilworth*, 142 Tex. 538, 179 S.W.2d 940, 942 (1944); *Estate of Griffin v. Sumner*, 604 S.W.2d 221 (Tex.Civ.App.—San Antonio 1980, *writ ref'd n.r.e.*). The agreement between Mathis and Brasher/Bravo Resources crosses this threshold. Mathis' principal function was to put Brasher in touch with an investor willing to fund the needed computer data base update, and to pay for the seismic and other costs involved in pinpointing a promising prospect. Mathis did this—he put Brasher and Humphrey together. The subsequent turns that the Brasher/Humphrey relationship took do not denigrate the value of Mathis' early effort. In addition, when matters progressed, Mathis was to do ownership and lease studies and stand ready to perform, as necessary, landman and operator's duties. In return he was to receive a quarter of the interest Bravo acquired in the transaction.

The court finds no ambiguity or indefiniteness as to the legal obligations of the parties, but if it had, the fact that Mathis performed his principal function when he secured an investor, would weigh heavily in his favor. *See Mooney v. Ingram*, 547 S.W.2d 314 (Tex.Civ.App.1977, *writ ref'd n.r.e.*); *Terrell v. Nelson Puett Mortgage Company*, 511 S.W.2d 366 (Tex.Civ.App. 1974, *writ ref'd n.r.e.*).

Texas law does not require that the written evidence of a contract be in a single document. The writing "requirement may be satisfied by two or more scripts in combination—for instance, letters passing between the parties or telegrams." *Central Power & Light Co. v. Del Mar, etc.*, 594 S.W.2d 782, 789 (Tex.Civ.App.1980).

The court concludes that the Statute of Frauds, Tex.Bus. & Com.Code Ann. § 26.01, has no application in the case at bar. The agreement between the parties was sufficiently memorialized in writing to satisfy the primary purpose of the statute, to prevent fraud and scuttle perjury. Those writings suffice to make clear the reciprocal obligations of the parties. Defendants do not persuade the court that their obligations are uncertain. *See Taggart v. Crews*, 521 S.W.2d 703 (Tex.Civ. App.1975, *after remand*, 543 S.W.2d 422, *writ ref'd n.r.e.*); *Cook v. Young*, 269 S.W.2d 457 (Tex.Civ.App.1954).

There will be judgment herein declaring that Mathis is entitled to one quarter, twenty-five percent, of all interests acquired by Brasher and Bravo Resources, from Humphrey and his companies, in the Four Corners area in the Texas counties of Martin, Dawson, Andrews, and Gaines.

There will be further judgment rejecting the demand of Smith.

Counsel for complainants will prepare a judgment consistent herewith and, before presenting to the court, will secure the signature of counsel for defendant for approval as to form only.

Shreveport, Louisiana, this 6th day of February, 1989.

/s/ Henry A. Politz
United States Circuit Judge
Sitting by Special Designation