J-A26040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ERIE INSURANCE EXCHANGE, AS SUBROGEE AND ASSIGNEE OF UNIVERSAL DEVELOPMENT MANAGEMENT, INC., T/D/B/A THE MEADOWS APARTMENTS, UDE OF MITCHELL ROAD, LTD. AND SHERRI LYNN WILSON | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : | |
| R. ERIC HALL AND R. E. HALL AND ASSOCIATES, P.C. | : : : | |
| _____ | : : | |
| SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA | : : : : | |
| v. | : : : | |
| R. ERIC HALL AND R. E. HALL AND ASSOCIATES, P.C. | : : : : | |
| APPEAL OF: ERIE INSURANCE EXCHANGE | : : | No. 370 WDA 2016 |

Appeal from the Order February 11, 2016
in the Court of Common Pleas of Lawrence County,
Civil Division, No(s): 11342-07; 11359-07

BEFORE:  BENDER, P.J.E., RANSOM and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED DECEMBER 28, 2016**

Erie Insurance Exchange ("Erie") appeals from the Order granting the

Motion for Summary Judgment filed by R. Eric Hall and R. E. Hall and

Associates, P.C. (collectively "Hall"), arising out of a legal malpractice claim

against Hall for their representation of Erie's insured, Universal Development

Management, Inc., t/d/b/a The Meadows Apartments, UDE of Mitchell Road,

Ltd. (collectively "UDE"), and Sherri Lynn Wilson ("Wilson"), in a federal lawsuit filed by Basem Hussein ("Hussein"). We affirm.

In September 1999, Hussein, an Egyptian nationalist who worked as a radiologist, was renting an apartment at Meadow Ranch in Lawrence County. UDE owned and operated Meadow Ranch, and Wilson acted as the manager of the building. On September 11, 2001, Hussein was working in New Mexico and was not in his apartment. On that date, Wilson and James Caparoula, a maintenance man, entered Hussein's apartment without permission. Wilson observed a desktop computer, various New York City phonebooks, and a flight manual for a Boeing 737. Wilson, suspecting terrorist activity, contacted the local police as well as the Pennsylvania State Police. The police, after investigating Hussein's apartment, contacted the Federal Bureau of Investigation ("FBI"). The FBI conducted an investigation into Hussein, after which he was cleared of any wrongdoing. The investigation received extensive coverage from the local and national media.

On December 19, 2001, Hussein filed an action against UDE and Wilson in the United States District Court for the Western District of Pennsylvania. Hussein alleged that UDE and Wilson violated the Civil Rights Act, the Fair Housing Act, and asserted state law claims of invasion of privacy[1] and trespass. As a result of Hussein's action, UDE and Wilson sought insurance coverage from Erie, Selective Insurance Company of South

---

[1] Hussein's invasion of privacy claim was based upon two separate legal theories—false light and intrusion upon seclusion.

Carolina ("Selective"), and American International Specialty Lines Insurance Company ("AISLIC"). Ultimately, Hall was hired to represent UDE and Wilson. Following a jury trial in September 2005, the jury found in favor of UDE and Wilson on the Civil Rights Act count, the Fair Housing Act count, and the trespass count. The jury found in favor of Hussein on the invasion of privacy count, specifically finding that UDE and Wilson invaded Hussein's privacy[2] and acted with "malice and reckless indifference." The jury awarded Hussein compensatory and punitive damages of $2,450,000. Following the jury verdict, UDE and Wilson filed a Motion requesting, *inter alia*, that the trial court enter judgment as a matter of law pursuant to

---

[2] The jury did not specify the legal theory under which Hussein's privacy was invaded.

Federal Rule of Civil Procedure 50,[3] in favor of UDE and Wilson. Notably, the trial court found this Motion waived based upon the failure to raise the motion prior to the case going to the jury, as required under Rule 50. UDE and Wilson filed a timely Notice of Appeal to the United States Court of Appeals for the Third Circuit. Thereafter, the matter was settled for $2.25 million.[4]

In September 2007, Erie filed the instant legal malpractice claim against Hall, averring that Hall's failure to make a proper Rule 50 motion resulted in a waiver of the claims. Erie further argued that either the trial court or the Third Circuit Court of Appeals would have dismissed the invasion of privacy claim had it been preserved. Following discovery, Hall filed a

---

[3] At the time of trial, Rule 50 stated the following, in relevant part:

**(a) Judgment as a Matter of Law**.

**(1)** If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

**(2)** Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

Fed. R. Civ. P. 50.

[4] The three insurers contributed to the settlement as follows: Erie—$983,333.33, Selective—$983,333.33, and AISLIC—$283,333.33.

Motion for Summary Judgment. Erie filed a Response and brief in opposition. The trial court held a hearing on the Motion, and thereafter, granted Hall's Motion for Summary Judgment. Erie filed a timely Notice of Appeal.

On appeal, Erie raises the following questions for our review:

I.   Did the trial court err in entering summary judgment in favor [of] Hall because there was insufficient evidence in the underlying federal trial record to sustain the jury's verdict on Hussein's claim for invasion of privacy based on intrusion upon seclusion?

II.  Did the trial court err in entering summary judgment in favor [of] Hall because there was insufficient evidence in the underlying federal trial record to sustain the jury's verdict on Hussein's claim for invasion of privacy based upon publicity placing a person in a false light?

III. Did the trial court err in finding that Wilson's reports to law enforcement were not protected communications under the **Noerr**-**Pennington** [d]octrine because the "sham" exception has no application here where the record is devoid of evidence of falsehood or malicious intent?

Brief for Appellant at 9.

Our standard of review where a trial court grants a motion for summary judgment is as follows:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment

may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non[-]moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Thompson v. Ginkel*, 95 A.3d 900, 904 (Pa. Super. 2014) (citation omitted).

In order to establish a claim of legal malpractice, a plaintiff must demonstrate the following:

1) employment of the attorney or other basis for a duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) that such negligence was the proximate cause of damage to the plaintiff. An essential element to this cause of action is proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or threat of future harm. In essence, in order to be successful in a legal malpractice action in Pennsylvania, the plaintiff must prove that he had a viable cause of action against the party he wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case.

*Nelson v. Heslin*, 806 A.2d 873, 876 (Pa. Super. 2002) (citations omitted).

We will address Erie's first two claims together because both involve Hall's purported negligence with regard to Hussein's invasion of privacy averments. In its first claim, Erie contends that the trial court erred in granting Hall's Motion for Summary Judgment, as Hall's negligence in failing to properly raise the Rule 50 Motion in the underlying Hussein case was the proximate cause of the harm to Erie. Brief for Appellant at 20. Erie argues

that there was insufficient evidence to support Hussein's invasion of privacy claim based upon an intrusion of seclusion. *Id*. at 20, 21-25. Erie asserts that while Wilson intentionally entered Hussein's apartment, her behavior would not be highly offensive to a reasonable person. *Id*. at 23, 25. Erie claims that Wilson's behavior was reasonable because the circumstances of the entry must be considered in the context of the terrorist attacks on September 11, 2001. *Id*. Erie further argues that Wilson's actions were not highly offensive where she did not trespass by entering the apartment, as Hussein's lease permitted the apartment owner to enter at all reasonable times, and the entry lasted less than five minutes. *Id*. at 23-25. Erie also contends that Wilson observed the items, which were not of an embarrassing or private nature, in plain view. *Id*. at 24.

In its second claim, Erie argues that Hall's negligence in failing to raise the Rule 50 Motion challenging the invasion of privacy—false light averment was the proximate cause of harm to Erie. *Id*. at 26, 35. Erie asserts that the trial court erred in determining that the Hussein trial record demonstrated that "Wilson fabricated, exaggerated and/or lied about what she observed in the apartment for the specific purpose of finding support for her belief that Hussein was a terrorist." *Id*. at 27 (citation omitted). Erie points out that the uncontroverted testimony of the law enforcement officers supported Wilson's observations. *Id*. Erie claims that the fact that Wilson

was mistaken about her observations does not require a finding that Wilson knowingly reported falsehoods. *Id*. at 28.

Erie additionally contends that the record does not establish, through clear and convincing evidence, that Wilson acted recklessly or with actual malice by reporting her observations to the police. *Id*. at 28, 30-31. Erie argues that Wilson's suggested personal animus toward Hussein does not establish malice. *Id*. at 31. Erie further argues that Wilson did not entertain serious doubts about her observations and concerns, and thus did not act recklessly or with malice. *Id*. at 31-32.

Erie also claims the trial record does not support a finding that Wilson "publicized" the information about Hussein. *Id*. at 32, 34. Erie argues that Wilson only reported her observations to the police, and did not speak with the media or the community at large. *Id*. at 34. Erie contends that the trial court erred in finding that it was reasonably foreseeable to Wilson that her report to the police would be broadly published to the public. *Id*. Erie asserts that a large number of people becoming aware of Wilson's communication to the police based upon subsequent media reports is not sufficient to support a finding that Wilson publicized the information. *Id*. at 34-35.

Here, the trial court set forth the relevant law, addressed Erie's claims, and determined that they are without merit. *See* Trial Court Opinion, 2/11/16, at 14-28; *see also id*. at 6-8 (wherein the trial court quotes a

summary of the evidence prepared by the federal trial judge in the underlying Hussein case). On appeal, Erie argues that such a Rule 50 motion would have been granted had the trial court considered Wilson's testimony at Hussein's invasion of privacy trial in light of the context, circumstances, and setting of the entry.

However, in examining a Rule 50 motion, federal courts "must draw all reasonable inferences in favor of the non[-]moving party, and it may not make credibility determinations or weigh the evidence." **Reeves v. Sanderson Plumbing**, 530 U.S. 133, 150 (2000); **see also id**. at 150-51 (stating that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.") (citation and quotation marks omitted); **CNH Am. LLC v. Kinze Mfg., Inc.**, 809 F. Supp. 2d 280, 285 (D. Del. 2011) (stating that in ruling on a Rule 50 motion, "the court must resolve all conflicts of evidence in favor of the non-movant."). Thus, the question for federal courts "is not whether there is literally no evidence supporting the party against whom the motion is directed[,] but whether there is evidence upon which the jury could properly find a verdict for that party." **Goodman v. Pennsylvania Tpk. Comm'n**, 293 F.3d 655, 665 (3d Cir. 2002); **see also Reynolds v. Univ. of Pennsylvania**, 684 F. Supp. 2d 621, 626 (E.D.

Pa. 2010) (stating that a motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference," a reasonable juror would have been required to accept the view of the moving party).

Here, the trial court, in ruling on a Rule 50 motion, would have been free to disregard Wilson's testimony and, further, could not favorably weigh or give a reasonable inference as to UDE and Wilson's evidence. Moreover, in reviewing the evidence of record, in a light most favorable to Hussein, there was sufficient evidence to support his invasion of privacy claims. **See** Trial Court Opinion, 2/11/16, at 14-28. Based upon this finding, neither the federal district court of the Third Circuit Court of Appeals would have granted a motion for judgment as a matter of law. Accordingly, the record establishes that Hall's failure to properly raise a Rule 50 motion caused no harm or loss to Erie, and Erie's first two claims are without merit. **See Nelson**, 806 A.2d at 876.

In its third claim, Erie contends that Wilson's reports to law enforcement regarding observations of Hussein's apartment were protected by the **Noerr**–**Pennington** doctrine.[5] Brief for Appellant at 36-37, 38-39.

---

[5] The **Noerr**–**Pennington** doctrine is based on the right to petition the government under the First Amendment of the United States Constitution. **See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.**, 365 U.S. 127 (1961); **United Mine Workers v. Pennington**, 381 U.S. 657 (1965).

Erie further argues that the "sham" exception to the *Noerr–Pennington* doctrine[6] has no application to the facts of this case. *Id*. Erie asserts that Wilson never intentionally communicated false information to law enforcement officers or made the reports simply to harass Hussein. *Id*. at 37-38; *see also id*. at 37 (wherein Erie argues that the trial court erred in finding that the *Noerr–Pennington* doctrine was inapplicable to this case because Wilson intentionally made false statements).

Initially, Hall argues that Erie waived this issue as the *Noerr–Pennington* doctrine was never raised in Erie's legal malpractice Complaint. Brief for Appellee at 48. Our review confirms that Erie did not raise a claim against Hall for failing to raise the *Noerr–Pennington* doctrine during Hussein's trial in its Complaint. Notwithstanding, in its Response to Hall's Motion for Summary Judgment, Erie argued that Hall committed legal malpractice for failing raise the *Noerr–Pennington* doctrine defense to Hussein's invasion of privacy – false light claim. Thus, we decline to conclude that Erie's claim is waived on this basis. *Cf. Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 37 (Pa. 2006) (stating that arguments not raised

---

[6] The "sham" exception to the *Noerr–Pennington* doctrine "involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." *Penllyn Greene Assocs., L.P. v. Clouser*, 890 A.2d 424, 429 n.5 (Pa. Cmwlth. 2005) (citation omitted). "Therefore, under the sham exception, an individual will be liable if he use[s] the governmental process—as opposed to the outcome of that process—as [a] ... weapon." *Id*. (citation omitted).

before the trial court in opposition to summary judgment cannot be raised for first time on appeal).

Nevertheless, in its appellate argument, Erie failed to argue that Hall committed legal malpractice for failing to raise the **Noerr–Pennington** doctrine defense at Hussein's trial. Instead, Erie merely argues that the **Noerr–Pennington** doctrine protected Wilson's reports to law enforcement. In its Opinion, the trial court addressed Erie's claim and determined that it is without merit. **See** Trial Court Opinion, 2/11/16, at 28-29. We adopt the sound reasoning the of the trial court and conclude that Erie's claim is without merit. **See id**.[7]

Based upon the foregoing, the trial court properly granted summary judgment in favor of Hall.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2016

---

[7] To the extent that Erie sought to raise a legal malpractice claim against Hall for failing to raise the **Noerr–Pennington** doctrine defense at Hussein's trial, we would conclude that such a claim is without merit. **See Nelson**, 806 A.2d at 876.

<u>OPINION</u>

MOTTO, P.J.                                    February 11, 2016

Before the Court for disposition is the Motion for Summary Judgment of the Defendant R. Eric Hall and R.E. Hall and Associates, P.C. relative to the claims of each of the plaintiffs. The above captioned cases are consolidated as they arise out of the same operative facts, and the arguments are identical as to each party relative to the issue of whether any professional negligence of then attorney, R. Eric Hall, hereinafter ("Hall") was the proximate cause of any harm to Plaintiffs as a matter of law. Hall was hired as an attorney by the Plaintiff insurance companies to represent and defend Universal Development Management, Inc., its affiliate U.D.E. of Mitchel Road, Ltd., hereinafter referred to collectively as "U.D.E." and Sherri Lynn Wilson, hereinafter ("Wilson") in a civil action filed by the Plaintiff Basem Hussein, hereinafter ("Hussein"), in the United States District Court for the Western District of Pennslvania. In that underlying case, Hussein prevailed on the tort of invasion of privacy, while the defendants prevailed on various other claims of Hussein.

Plaintiffs' claim of professional negligence is based on the failure of Hall to move for judgment as a matter of law at the close of Plaintiffs' case in the underlying lawsuit pursuant to Federal Rule of Civil Procedure 50(a).

The making of an FRCP 50(a) motion prior to the case going to the jury was a prerequisite to seeking judgment as a matter

of law after the jury's verdict. Hall did seek judgment as a matter of law after the jury's verdict, but the federal trial judge found that the right to seek judgment as a matter of law on the invasion of privacy claim was waived because of the failure to file the FRCP 50(a) motion at the close of the Plaintiffs' case that was sufficiently specific. Thus, Plaintiffs argue that Hall's failure to make a timely sufficient FRCP 50(a) motion barred the underlying defendants from arguing that the verdict of the jury was against the weight of the evidence or contrary to law. Plaintiffs further argue that Hussein had failed to offer sufficient evidence to make out a prima facie case for the tort of invasion of privacy and that Hall's failure to make a timely sufficient FRCP 50(a) motion barred any opportunity for post-trial or appellate relief.

Hall's Motion for Summary Judgment is based on the argument that the evidence of record in the underlying trial was sufficient to support the jury's verdict; therefore, even if Hall had presented a FRCP 50(a) motion, the trial judge would have been required to deny the motion. Further, on appeal, the Third Circuit Court of Appeals would not have reversed the jury's verdict. Defendant asserts that the issue of proximate causation is a question of law for this Court to determine based on the court record of the underlying trial; that how the federal trial court or third circuit would have ruled after considering the trial court record is a question of law for this Court to resolve and not a jury question.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

3

The Court here finds that the determinative issue is whether the trial record would have required that the federal court deny the motion for judgment as a matter of law pursuant to FRCP 50(a)(1) on the basis that there existed legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff Hussain on the issue of invasion of privacy had the rule 50(a)(1) motion been made by Hall.

## HISTORY OF THE CASE

Hussain filed a federal lawsuit, hereinafter ("Underlying Action") against U.D.E. and Wilson as the result of actions of Wilson who was the property manager of the apartment complex in which Hussein was a tenant and which was owned by U.D.E. in Lawrence County at the time of the September 11, 2001 terrorist attacks, hereinafter ("9/11 attacks"). On that date, Wilson entered Hussain's apartment in his absence and reported Hussain to law enforcement as possessing items which were suspicious of terrorist activities. As the result of Wilson's reporting to state and local law enforcement, Hussain was detained and interrogated by the Federal Bureau of Investigation and was terminated from his employment. The suspicions of Hussein's involvement in the 9/11 attacks received a great deal of publicity. Hussein was also subpoenaed to attend a federal grand jury investigation relative to his suspected terrorist activity. However, the investigation revealed no evidence of terrorist activity by Hussein, Hussein was never charged with

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

any criminal offense and the federal grand jury proceedings against him were terminated.

The Complaint filed in the underlying action against the underlying defendants consisted of four counts: Count I-Violation of 42 U.S.C. §1981; Count II-Violations of the Fair Housing Act, 42 U.S.C. §3604(b); Count III-Invasion of Privacy and Count IV-Trespass. Following a jury trial, the jury returned verdicts in favor of the defendants as to Counts I, II and IV, but returned a verdict for Hussein as to Count III-Invasion of Privacy. The jury awarded compensatory damages of $850,000 and punitive damages of $1,600,000. The jury specifically found that the underlying defendants "invaded the privacy" of Hussein; and, further, as to the issue of punitive damages, found that the underlying defendants "acted with malice and reckless indifference to the rights of [Hussein].."

Following the verdict of the jury, Hall filed a FRCP 50(b) motion and a motion to alter judgment pursuant to FRCP 59. The federal trial judge denied the motions. In denying the motions, the federal trial judge found that, although Hall had made an oral FRCP 50(a) motion at the close of Hussein's case, because the oral motion was not sufficiently specific with regard to the issue of sufficiency of the evidence in support of Hussein's invasion of privacy claims, Hall could not raise such issues for the first time under FRCP 50(b), nor could the issue be raised in a motion to alter or amend judgment pursuant to FRCP 59(e). However, the trial judge found that the issue of "whether the jury's award of punitive damages was

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

5

inappropriate, i.e., whether remittitur should be granted" was not waived and addressed the issue of the sufficiency of the evidence to justify the award of punitive damages. The federal trial judge concluded that viewing the facts in the light most favorable to Hussein, the court could not conclude that the underlying defendants' "misconduct was so lacking in reprehensive ability that the jury's award of punitive damages should be disturbed."

The following excerpts from the January 3, 2006 memorandum of the federal trial judge contain a summary of the evidence and the federal court's analysis of the issue as to sufficiency of the evidence relative to the punitive damage claim:

> [Hussein] is a radiologist of Arabic descent and, at the relevant time, was a resident of the Meadows Apartments. ("The Meadows"). Defendant Sherri Lynn Wilson ("Wilson") was the resident manager of The Meadows. After the terrorist attacks occurred, Wilson, with the assistance of The Meadows' maintenance man, entered [Hussein's] apartment and looked around at the contents and conditions thereof. Wilson reported to the local police that the items and conditions that she found in the apartment were suspect and possibly indicative of terrorist activity. For example, Wilson reported that she found a white powder on countertops in the apartment. The white powder turned out to be dust. She also told police that she saw a flying manual for a commercial jet airplane and a computer disc jacket which depicted an airplane exploding in mid-air. The "flying manual' was an instruction for a computer game, and the computer disc jacket, which also related to a computer game, actually depicted a plane flying into the sunset. [Hussein] introduced considerable evidence at trial from which a jury could have believed that Wilson either grossly exaggerated or simply lied about the existence and/or character of the items that she saw in the apartment. The Federal Bureau of Investigation ("FBI") quickly became involved in an investigation of [Hussein] and

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

obtained a search warrant for his apartment, which was immediately executed. At the time of the terrorist attacks, [Hussein] was working as a radiologist on assignment in New Mexico on a "locum tenens" basis. The FBI located and detained [Hussein] in New Mexico and questioned him regarding his knowledge of and involvement in the terrorist attacks. The matter received considerable publicity in the local and national media after September 11, 2011. [Hussein] was also subpoenaed to testify before a federal grand jury impaneled in the western district of Pennsylvania, but the FBI investigation of [Hussein] was discontinued before his grand jury appearance was scheduled to take place. [Hussein] was never charged with a criminal offense, and the FBI investigation ultimately concluded that he had no connection whatsoever to the terrorist activity. All of the items found by the FBI in [Hussein's] apartment were lawful to possess and had some innocent explanation. Nonetheless, [Hussein] was terminated from his position in New Mexico. Additionally, [Underlying Defendants] declined to renew [Hussein's] two-month lease at The Meadows Apartments and he was forced to relocate. (Emphasis provided).

....

Suffice it to say that there was ample evidence of record from which a jury could have, and did, infer that the actions of Wilson were taken with malice or, at the very least, reckless indifference to the rights of [Hussein]. The jury could have easily believed that Wilson entered [Hussein's] apartment under the pretext of changing furnace filters in order to "snoop around." The jury could have easily believed that Wilson fabricated, embellished, or simply lied about what she saw in [Hussein's] apartment in order to paint a picture of him as a terrorist to the police. The actions of Wilson, viewed in the light most favorable to [Hussein], highly support [Underlying Defendants'] contention that she acted exclusively out of concern for the health and safety of other residents. The Court also rejects [Underlying Defendants'] contention that Wilson could not have contemplated "the complex chain of events that transpired after her entering into [Hussein's] apartment." Everything that transpired after Wilson reported what she saw in [Hussein's] apartment to the local police was more or less what a reasonable person might expect to occur under the circumstances, i.e., the response by the law enforcement community was not hardly surprising in light of the horrific terrorist

attacks which had occurred earlier that day.

. . . .

> The conduct at issue in this case occurred over a
> relatively short period of time, and in some
> respects might be considered an isolated incident.
> On the other hand, Wilson took multiple voluntary
> actions on the day in question. The jury could
> have found that there was no justifiable basis for
> entry into [Hussein's] apartment that day, and
> that her excuse that the furnace filters needed
> to be changed was a mere ruse. The jury also could
> have believed that she lied to the police about
> what she saw and did so with malice, which set in
> motion the investigation and detention of [Hussein].

The Underlying Defendants filed an appeal from the Order and Memorandum of the federal trial judge to the Third Circuit Court of Appeals. However, the appeal was never heard as Plaintiffs entered into a settlement with Hussein in the total amount of $2,250,000, with each Defendant and a third insurance company contributing the following amounts: (a) Erie--$983,333.33; (b) Selective--$983,333.33; and (c) AISLIC--$283,333.33.

Although not relevant to the issue here which the Court finds to be dispositive, Plaintiffs and AISLIC signed a document entitled "Insurers' Agreement" in which each insured reserved their rights to bring claims against Hall as well as against each other. Further, Plaintiffs Erie and Selective each signed a document titled "Mutual Release" wherein Erie and Selective released each other and all of their respective agents, including attorneys, from all liability in connection with the underlying action. Following payment of the settlement funds and the execution of the mutual release, the underlying defendants executed assignments of the legal malpractice claim

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

8

to Erie and Selective, following which the Plaintiffs filed the within actions seeking recovery of the amounts paid in settlement of the underlying action. Plaintiffs' Complaint alleges professional negligence on the basis that Hall failed to move for dismissal of the invasion of privacy claims pursuant to FRCP 50(a) of the Federal Rules of Civil Procedure, causing waiver of the claim of insufficiency of the evidence relative to the invasion of privacy claim. Plaintiffs further contend that had the FRCP 50(a) motion been made, the federal trial judge would have been required to dismiss the invasion of privacy claim, and if the trial judge had not dismissed the claim, the Third Circuit would have reversed the trial judge and dismissed the claim on appeal.

## DISCUSSION

Defendant's Motion for Summary Judgment asserts that as a matter of law Plaintiff cannot prove that any action of Hall was the proximate cause of any loss to Plaintiffs. The negligence asserted against Hall is his failure to make a proper FRCP 50(a) motion challenging the sufficiency of the evidence as to any applicable theory of the Tort of Invasion of Privacy. In other words, Hall's argument is that, even if Hall had made a proper FRCP 50(a) motion on behalf of the Underlying Defendants, the motion would have been denied because as a matter of law there existed sufficient evidence of record to give the case to the jury on two separate theories relative to the Tort of Invasion of Privacy.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

FRCP 50(a) of the Federal Rules of Civil Procedure specifically provides as follows:

> (a) <u>Judgment as a matter of law</u>
> (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the Court may determine the issue against that party and may grant a motion for judgment as a matter of law...

The question of whether to grant a FRCP 50(a) motion is a question of law for the trial judge to determine at the time of trial, if the motion is made. If made at trial, the trial judge must determine whether or not to grant the motion based upon the trial record as it existed at the time the motion is made. If, as a matter of law, a legally sufficient evidentiary basis existed for a reasonable jury to find for Hussein, then a FRCP 50(a) motion would have been fruitless, and would necessarily have been denied. Thus, the failure to file a FRCP 50(a) motion could not be the proximate cause of any harm to the Underlying Defendants as the motion could not have been granted. On the other hand, if there cannot be found in the federal trial record a legally sufficient evidentiary basis for a reasonable jury to find for Hussein on the issue of Invasion of Privacy, the failure to make a FRCP 50(a) motion, with the result of wavier of the right to subsequently raise the issue in a FRCP 50(b) motion, would constitute professional negligence that was the proximate cause of injury, as the right and opportunity to secure a dismissal of the cause of action that resulted in a jury verdict was lost due to counsel's negligence.

It is clear to this Court that the resolution of the issue of proximate cause is a matter of law as the record that was available to the federal trial judge is equally available to this Court. The question of sufficiency of the evidence does not involve any fact-finding process that could be resolved by a jury or other fact-finder. The Court agrees with the Defendant's position that the issue is not a matter to be resolved by expert testimony as the opinion of any expert can only be a substitute for the analysis which a reviewing judge must apply in determining sufficiency of the evidence.

In order to prevail on a claim of legal malpractice, the plaintiff must establish that the defendant-attorney's negligence was a factual cause in causing damage to the plaintiff. Kituskie v. Corbman, 714 A.2d 1027, 1030 (Pa. 1998). The plaintiff is required to prove actual loss, rather than merely a beach of professional duty. Kituskie, 714 A.2d at 1030. The plaintiff's actual losses are measured by the judgment the plaintiff lost in the underlying action. Id. As further stated in Rizzo v. Haines, 555 A.2d 58, 68 (Pa. 1989), "when it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action, ..., is proof of actual loss." Plaintiff must prove that "but for" the conduct of the attorney-defendant, plaintiff would have prevailed against the opposing party in the underlying case. Kituskie v. Corbman, Supra.; Myers v. Seigle, 751 A.2d 1182, 1185 (Pa.Super. 2000).

If Hall could not have prevailed on a FRCP 50(a) motion, his failure to make the motion cannot be considered to be the proximate cause of any harm to Plaintiffs. The Plaintiffs herein do not dispute this conclusion, but argue that at the trial of the underlying case, Hussein failed to offer evidence adequate to make out a prima facie case of the tort of Invasion of Privacy; therefore, Hall's failure to make an adequate FRCP 50(a) motion barred the opportunity for post-trial or appellate relief. (Brief of Plaintiff Erie, p. 2). The Court here has set forth its agreement with Hall's argument that the question is one of law to be determined by the Court, and there exists ample case law to support this conclusion. Harsco Corp. v. Kerkim, Stowell, Kondracki & Clarke, P.C., 965 F.Supp. 580 (M.D.Pa. 1997), holding that the question of whether Plaintiff' would have prevailed on its defense was a question of law to be reviewed by the court to see if it would have been granted in the underlying case; Scaramuzza v. Sciolla, 2006 U.S.Dist.Lexis 8264 (Ed.Pa. 2006), holding that since a motion for judgment as a matter of law would clearly have been decided by the judge in the underlying action, it was for the court in the legal malpractice action to determine if Scaramuzzo would have been relieved of individual liability had defendant filed the appropriate post-trial motion; Gans v. Gray, 612 F.Supp. 608 (Ed.Pa. 1985), where the court granted summary judgment in favor of the attorney-defendant after reviewing the record in the underlying action and determined as a matter of law that the trial record supported the jury's verdict.

Plaintiffs assert that summary judgment should be denied because there are issues of fact, but fail to identify specific factual issues. Instead, Plaintiffs present an argument that the federal trial record was insufficient to support a finding of invasion of privacy. Although the Court agrees that the question of whether or not the federal trial record was sufficient or not to support a finding of invasion of privacy by the jury is dispositive, this is clearly not a fact issue but rather a legal issue; therefore, it cannot be determined by a jury or any other factfinder.

Similarly, because the question is a matter of law, expert testimony is not permissible. Plaintiffs go to great lengths to discuss the analysis presented by former Judge Bruce Kaufman on the issue of the sufficiency of the evidence; however, the Kaufman Opinion is merely doing the same thing that the reviewing court must do, which is to review the federal trial record and determine as a matter of law whether or not the evidence was sufficient to support the jury's verdict as to invasion of privacy. Judge Kaufman has done nothing more in his opinion than to review and analyze the evidence and determine that it is insufficient evidence upon which a reasonable jury could find that Wilson had knowledge of or acted in reckless disregard as to the falsity of that which she promptly reported to appropriate law enforcement authorities. The analysis in conclusion of the expert is not a matter of evidence but simply a substitute for the work of the judge. Where the issue is one of law, expert testimony is not

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

admissible in determining the question of law.  <u>Waters v. State Employees' Retirement Bd.</u>, 955 A.2d 466 (Pa.Commw. 2008); <u>Browne v. Commw. of Pennsylvania</u>, 843 A.2d 429 (Pa.Commw. 2004); <u>41 Valley Assocs. v. Bd. of Supervisors of London Grove Twp.</u>, 882 A.2d 5 (Pa.Commw. 2005).

All parties agree that the Seminole case in setting forth the standard of review to be applied in determining motions for judgment as a matter of law pursuant to Rule 50 is <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 120 S.Ct. 2097 (2000).  <u>Reeves</u> set forth the following principles in deciding a motion for judgment as a matter of law:  (1) The court must review all of the evidence in the record; (2) The court must draw all reasonable inferences in favor of the non-moving party (here, Plaintiffs); (3) The court may not make credibility determinations or weigh the evidence; and (4) Although the court should review the record as a whole, it must disregard all evidence favorable to the non-moving that the jury is not required to believe; and that the court should give credence to the evidence favoring the non-movant as well as evidence supporting the moving party that is uncontracted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. at 150-151.  Ultimately, the question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly found its verdict.  <u>Gomez v. Allegheny Health Servs. Inc.</u>, 71 F.3d 1079, 1083 (3rd Cir.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

1995) citing <u>Eshelman v. Agere Systems, Inc.</u>, 554 F.3d 426 (3rd Cir. 2009).

Thus, in view of the foregoing, the Court must view the evidence in the light most favorable to Hussein as the verdict winner and give Hussein the advantage of every fair and reasonable inference, and further, must disregard all evidence favorable to the Underlying Defendants that the jury was not required to believe.

As noted by the federal trial court in its Memorandum Opinion:

> Although judgment as a matter of law should be granted sparingly, "federal courts do not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which a jury could properly find a verdict for that party." <u>Patzig v. O'Neil</u>, 577 F.2d 841, 846 (3rd Cir. 1978). "A jury verdict can be displaced by judgment as a matter of law only if the record is critically deficient of the minimum quantum of evidence from which a jury might reasonably afford relief." <u>Wilson v. Philadelphia Detention Center</u>, 986 F.Supp. 282, 286 (E.D.Pa. 1997)(Federal trial court opinion of January 3, 2006, p. 4).

The federal trial court submitted the tort of Invasion of Privacy to the jury and charged the jury on two separate theories on Invasion of Privacy under Pennsylvania law; towit, Intrusion Upon Seclusion and Publicly Placing Person in False Light.

In <u>Vogel v. W.T. Grant</u>, 327 A.2d 133 (Pa. 1974), the Supreme Court addressed the tort of Invasion of Privacy, and, citing §652 of the tentative draft of the Restatement Second of Torts, articulated four distinct torts that constitute Invasion

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

15

of Privacy: 1) Intrusion Upon Seclusion, 2) Appropriation of Name or Likeness, 3) Publicity Given to Private Life, and 4) Publicity Placing a Person in a False Light. Subsequently, in Harris by Harris v. Easton Publishing Co., 483 A.2d 137 (Pa.Super. 1984), the Superior Court referenced a final draft of the Restatement Second of Torts, §652 stating that it most ably defined the elements of Invasion of Privacy as the tort has developed in Pennsylvania.

Second 652B of the Restatement Second of Torts defines "Intrusion Upon Seclusion" as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Comment b to the foregoing Restatement provision is illustrative of the type of activity that would create liability:

> b. The invasion may be by the physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or wallet, examining his private bank account or compelling him by a forged court order to permit an inspection of his personal documents. The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlines.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

There are essentially two elements to Invasion of Privacy by Intrusion Upon Seclusion. First, defendant must have intruded into a private place, or must have otherwise invaded a private seclusion that the plaintiff has strewn about his person or affairs; secondly, the interference with the plaintiff's seclusion must be substantial and would be highly offensive to the ordinary reasonable person. Harris by Harris v. Easton Publishing Co., Supra.

In O'Donnell v. United States of America, 891 F.2d 1079 (3rd.Cir. 1989), the Third Circuit addressed what constitutes an "Intentional Intrusion." The court stated that an "Intrusion Upon Seclusion" claim involves a defendant who does not believe that he has either the necessary personal permission or legal authority to do the intrusive act; the intrusion must be intentional. See Wolfson v. Lewis, 924 F.Supp. 1413 (Ed.Pa. 1996).

Further, in determining whether an invasion of privacy interest would be offensive to an ordinary, reasonable person, the factfinder must consider all of the circumstances including the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion; the intruder's motives and objectives, as well as the setting into which he intrudes and the expectations of those whose privacy is invaded. Wolfson v. Lewis, 924 F.Supp. at 1421. Publication of the information discovered is not required to constitute the tort but recovery is based upon the viewer's use of the private

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

17

information obtained as the result of the intrusion. <u>O'Donnell</u> <u>v. United States of America</u>, Supra.

The federal trial court also instructed the jury on the Invasion of Privacy Theory of Publicity Placing Person in False Light, also a tort recognized by Pennsylvania Law. <u>Vogel v.</u> <u>W.T. Grant Co.</u>, Supra; <u>Harris by Harris v. Easton Publishing</u> <u>Co.</u>, Supra. Section 652(e) Publicity Placing Person in False Light is defined by the Restatement Second of Torts as follows:

> One who gives publicity to a matter concerning another that places the other before the public in false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard to the falsity of the publicized matter and the false light in which the other would be placed.

The essence of this cause of action is that the defendant created a false impression by knowingly or recklessly publicizing selective pieces of information that tend to imply falsehoods and placed the plaintiff in a false light. The question is not whether or not the statements or information publicized is true or false but whether the publication was susceptible to inferences casting one in a false light. <u>Larson</u> <u>v. Philadelphia Newspapers</u>, 543 A.2d 1181 (Pa.Super. 1988), alloc. denied, 552 A.2d 251 (Pa. 1988), cert. denied, 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989). As the Superior Court stated in <u>Larson</u>:

> ...recovery in tort for the disclosure of public,

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

18

as well as private, facts, even though they be true, is warranted to protect a claimant's right to be free from being placed in a false light and incurring the resultant mental suffering, shame or humiliation which may be caused by the discriminant publication of such facts.

. . . . .

The falsity with which we are concerned arises from the inference derived from published statements, whether those statements are actually true or not.

. . . .

In other words, despite the accuracy of the facts disseminated, discrete presentation of information in a fashion which renders the publications susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed.

Larson, 543 A.2d at 1189.

As noted in Curran v. Children's Center of Wyoming County, 578 A.2d 8 (Pa.Super. 1990), the interests protected is the interests of the individual and not being made to appear before the public in an objectionable false light or false position. See f Restatement Second of Torts §652(e), Comment (b).

Hussein was a resident of The Meadows Apartments from September 1999 through October 2001. On September 11, 2001, Defendant was on a month-to-month lease. The relationship between Wilson and Hussein was described as a business relationship as the result of the lease arrangement in the apartment complex where Wilson was the property manager. Wilson described Hussein as arrogant, condescending, difficult to talk to and that he treated all women in such manner. Wilson also described Hussein as "scary looking" and that he may be a "terrorist".

Wilson testified as to an incident wherein Hussein's parents left a note on his door stating "Allah will deal with you. You have disappointed your family and Allah will make you pay."

Wilson further testified that approximately a month prior to the 911 attacks, Hussein had a Middle Eastern male visitor and woman visitor. Wilson had seen no visitors prior to that occasion. Wilson also stated that she had to advise Hussein on several occasions that he was driving too fast.

In January of 2001, Wilson entered Hussein's apartment with a maintenance man, John Deal, to inspect its condition. Wilson testified that on that occasion she observed that the tops of the bathroom countertops were swollen or peeling and were covered with a white powdery substance and that a red powder was observed in the bathroom. Wilson did not advise Hussein to clean the apartment.

On the morning of the 9/11 attacks, Wilson and maintenance man, James Caparoula, entered Hussein's apartment. Hussein was not present in the apartment and had not been given notice of entry.

Wilson gave several difference reasons for the entry into the apartment. She initially informed the state police that she entered the apartment to check on the well-being of Hussein since she had not seen him in several days. At trial, Wilson testified that Caparoula was scheduled to change furnace filters that day and she accompanied him to inspect the cleanliness of the apartment. Approximately six months after

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

the incident, Wilson had Caparoula sign a notarized statement stating that he was in the apartment only to change furnace filters. However, at trial, Caparoula testified that he was never scheduled to change furnace filters and that the statement that he signed at Wilson's direction was not true.

The evidence as to what Wilson did and could have seen or did see once inside the apartment was conflicting.

Wilson testified that she looked at items in the apartment that were lying around and never opened any cabinets, did not pull out any video tapes or spread any items around for the police to have seen in plain view. Wilson claimed to have seen a video tape that was titled "How to Make a Bomb" on the side that was in a generic box in the area of the computer. Hussein in his testimony disputed much of Wilson's testimony. He stated that he did not leave things such as videos or any CD case lying around. One could not have seen the titles to video tapes in plain view. All of the video tapes that he had were in locked cabinets. The video tapes were not open to just a casual observer unless they opened the cabinets, which were definitely closed. Further, Hussein testified that he had no video entitled "How to Make a Bomb" and none was ever found or offered as evidence at trial.

Wilson testified as to having picked up and opened a computer jacket which she described as black and orange with a tilted plane going through two buildings in flames. Wilson told the police that the disc jacket had a picture of a passenger plane coming into a background in which the buildings

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

21

were on fire. Wilson in a separate statement described the disc jacket as depicting an airplane exploding in midair in a ball of fire. No computer jacket matching any of the descriptions given by Wilson were found. There did exist in the apartment a disc jacket with a plane with the sun in the background which was a Microsoft computer game and entered into evidence.

Wilson picked up and opened a flight manual titled "How to Fly a Boeing 737". She testified that it opened to an instruction page describing how to take off as though it had been opened to that page many times. This statement was disputed by Hussein who referred to the statement of having opened to a particular page many times as being "ridiculous" and that the "flight manual" was an instruction manual for a computer game called "Microsoft Flight Simulator."

Wilson went into the bathroom, Hussein's bedroom and spare room of the residence. She reported seeing New York City phonebooks. Hussein testified that the phonebooks were in boxes in his spare room and could only have been discovered if someone actually "went through that stuff." Hussein also explained that he had previously resided in New York City which was why he had the phonebooks.

Wilson went to the Pennsylvania State Police barracks in New Castle, Pennsylvania and informed Pennsylvania State troopers that the items in the apartment were suspicious and possibly indicative of terrorist activity. In general, Wilson told the state police about the above described items that she

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

22

claims to have viewed, the picture of an exploding airplane, and that Hussein had expensive computer equipment and that she had seen burns or acid around sink and the bathrooms were eaten up and burned or corroded by acid. She also referenced a wrapped package with Arabic lettering, having previously viewed a white powdery substance which she believed was "drugs or something" and that she suspected Hussein of being a terrorist.

Wilson left the state police barracks with a belief that the state police were "blowing her off" resulting in her then going to the Neshannock Police Department. As the result of her efforts, the Federal Bureau of Investigation became involved and interviewed Wilson at the New Castle State Police barracks. The FBI called a hazardous material response unit to the scene because of the report of possible bomb activity.

The FBI conducted a search of Hussein's apartment. The FBI then located and detained Hussein in New Mexico where he was questioned during the evening hours of 9/11. On September 12, 2001 Hussein was handcuffed and taken to FBI Headquarters where he was fingerprinted and samples of his hair were taken.

The FBI in New Mexico issued a statement on September 13, 2001 that Hussein had done nothing wrong. The Pittsburgh FBI investigation was discontinued. Hussein had been subpoenaed to testify before a federal grand jury in the Federal District Court for the Western District of Pennsylvania, which proceeding was then cancelled before Hussein had to testify.

The FBI concluded that the "white powder" reported by Wilson as drugs was household dust; no videotape entitled "How

to Make a Bomb" was found nor any evidence of bomb making. Flight-simulator discs were found but none depicting an exploding plane or buildings on fire. All of the computer games found were referred to as being "perfectly legal. The orange-yellowish substance near the toilet was dried urine and no chemical burns were found.

In considering the foregoing evidence, and following the required standard of resolving all conflicting evidence in favor of Hussein and against the Underlying Defendants, and in giving Hussein the benefit of all reasonable inferences and in further recognizing that a jury was free to resolve all credibility issues against Wilson and in favor of Hussein, the Court finds that the evidence in the federal trial record was sufficient to sustain the jury's verdict on Invasion of Privacy as to both theories submitted to the jury.

Relative to the issue of Intrusion of Seclusion, the jury could have easily found from the evidence that the initial entry into Hussein's was gained by the pretext of changing the furnace filters, when in actuality the purpose of entry was to examine the contents of the apartment. The jury could have inferred that once Wilson gained entry under a false pretext, she used that opportunity to examine Hussein's personal belongings, those in plain view and those not in plain view. Thus, the issue is not whether Wilson trespassed, but whether or not she used her ability to gain access to the apartment for purposes of intruding into Hussein's personal affairs.

Further, there existed sufficient evidence for the jury to find that Wilson thrust herself into private and personal matters of Hussein under circumstances where she was substantially certain that she had no privilege or permission to intrude. Wilson testified to have seen New York City phonebooks; however, Hussein testified that the phonebooks were contained in closed boxes in the spare room, and she would have had to enter the room and open the boxes and examine the contents thereof in order to observe the phonebooks. By Wilson's own admission, she picked up and opened a "flying manual", a computer jacket and looked at video boxes and video cases which she could have only have seen, according to the testimony of Hussein, by opening cabinets and pulling out a tape since titles to the videos were not visible in plain view. There was testimony that the videos that were looked at by Wilson were in a video stand, which was closed and locked. Wilson herself admitted to going into the bathroom, the bedroom and the spare room. The jury could reasonably find that entering these rooms and examining contents thereof under the circumstances as to these items as identified by Hussein had nothing to do with changing furnace filters but to intrude upon Hussein's privacy. One cannot imagine an area more personal and secluded to oneself and more private that one's residence and the private affairs that are contained therein. The jury was justified from the record in finding that Wilson intruded into that private space of Hussein.

The jury was also free to conclude that Wilson acted intentionally because of a personal animus that she had relative to Hussein as she believed him to be a terrorist and that her purpose in entering his apartment was to examine his personal affairs to find support for her belief that he was a terrorist. There is ample evidence that Wilson was distrustful of Hussein as she viewed him as arrogant, condescending and unfriendly; that Hussein's parents left a note that Allah would make him pay and that a package with Arabic writing was delivered to Hussein.

Additionally, the jury was free to conclude from the evidence that Wilson knew or acted in reckless indifference or disregard to the truth of what she observed by finding that Wilson fabricated, exaggerated and/or lied about what she observed in order to support her belief that he was a terrorist. Such inferences can be made from the evidence that the white powder which Wilson suggested to be drugs or Anthrax was household dust; that she lied about any evidence of bomb making including any video entitled "How to Make a Bomb"; that she referred to a "flying manual" which in reality was a Microsoft flight simulator game and clearly marked as such; that there in fact existed no computer disc jacket that showed an airplane and buildings on fire and that the existence of the same was contrived by her; that what Wilson identified as red powder was simple dried urine; and that any computer games and tapes that were in the apartment were perfectly legal and observable as such.

Wilson's actions triggered a federal investigation that resulted in Hussein being detained, questioned, handcuffed, and further resulted in Hussein losing his employment and being the subject of embarrassing nationwide media coverage with person humiliation. Thus, from all the foregoing, the jury could easily conclude that the intentional intrusion was substantial and highly offensive to a reasonable person.

There also existed sufficient evidence in the federal trial record to support the theory of False Light Invasion of Privacy given to the jury. The evidence in the record must be sufficient to have allowed the jury to conclude that Wilson gave publicity to a matter concerning Hussein that placed him before the public in a false light which would be highly offensive to a reasonable person. The jury can conclude from the evidence that Wilson communicated with law enforcement and made statements of what she claimed to have seen in Hussein's apartment, and that virtually all of what she claimed to have seen was false. The "false light" in which Hussein was portrayed was that of being a terrorist. Wilson set in motion through her publicity a chain of events that portrayed Hussein in the national media as a possible terrorist. As to the requirement that Wilson had knowledge of or reckless regard to the falsity of the publicized matter and of the false light in which Hussein would be placed, it has already been discussed that allowable inferences are that Wilson fabricated, exaggerated and/or lied about what she observed in the

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

27